Kim D. Stephens, P.S., OSB No. 030635
Jason T. Dennett, pro hac vice forthcoming
TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Ave., Ste. 1700
Seattle, WA 98101-3147
Tel: (206) 682-5600
kstephens@tousley.com
jdennett@tousley.com

*[Additional counsel listed on signature page]*

*Attorneys for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| **FERNANDO CUETO**, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**COALESCE, LLC d/b/a BENEFITELECT**,<br><br>Defendant. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Fernando Cueto ("Plaintiff"), through his attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Coalesce, LLC d/b/a BenefitElect ("BenefitElect" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the

following on information and belief—except as to his own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1.      This class action arises from Defendant's failure to protect highly sensitive data.

2.      BenefitElect is a full-service benefits administration platform offering HR software services.[1]

3.      As such, Defendant stores a litany of highly sensitive personal identifiable information ("PII") about its current and former clients and their employees. But Defendant lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

4.      On April 2, 2025, Defendant "became aware of potentially suspicious activity within certain systems in [its] computer network."[2] Defendant's investigation revealed that "the activity was the result of a Crush FTP vulnerability and an unauthorized actor likely copied files from a BenefitElect system between March 30, 2025, and March 31, 2025."[3]

5.      Upon information and belief, this cybersecurity incident compromised the PII of Defendant's current and former clients and their employees, including but not limited to their "names, addresses, dates of birth, Social Security numbers, and financial account information."[4]

6.      In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals roam undetected and steal its current and former clients' and their employees' PII.

---

[1] *Home,* BENEFITELECT, https://www.benefitelect.com/ (last visited October 24, 2025).
[2] Notice of Data Security Incident, https://benefitelect.com/security-incident/ (last visited October 24, 2025).
[3] *Id.*
[4] *Id.*

7.     On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, Defendant's failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals.

8.     Plaintiff is a Data Breach victim. He brings this class action on behalf of himself, and all others harmed by Defendant's misconduct.

9.     The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this data breach, BenefitElect's clients' employees' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

## PARTIES

10.     Plaintiff, Fernado Cueto, is a natural person and resident of Yonkers, New York, where he intends to remain.

11.     Defendant, Coalesce, LLC d/b/a BenefitElect, is a company formed under the laws of Delaware and with its principal place of business at 61128 SE Stari Most Loop #L, Bend, Oregon.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiff and Defendant are citizens of different states. And there are over 100 putative Class Members.

13.     This Court has personal jurisdiction over Defendant because it is headquartered in Oregon, regularly conducts business in Oregon, and has sufficient minimum contacts in Oregon.

14. Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND

*BenefitElect Collected and Stored the PII of Plaintiff and the Class*

15. Defendant BenefitElect is a full-service benefits administration platform offering HR software services.[5]

16. As part of its business, Defendant receives and maintains the PII of thousands of its current and former clients and their employees.

17. In collecting and maintaining the PII, Defendant agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their PII.

18. Under state and federal law, businesses like Defendant have duties to protect the PII in their custody and to notify owners of said PII about data breaches.

19. Defendant recognizes these duties, promising in its "Privacy Policy" that:

    a.    "BenefitElect Administration Portal is committed to protecting your privacy and developing technology that gives you the most powerful and safe online experience;" and

    b.    "BenefitElect Administration Portal secures your personal information from unauthorized access, use or disclosure;"

---

[5] *Home,* BENEFITELECT, https://www.benefitelect.com/ (last visited October 24, 2025).

      c.     "BenefitElect Administration Portal secures the personally identifiable information you provide on computer servers in a controlled, secure environment, protected from unauthorized access, use or disclosure;"

      d.     "When personal information (such as a credit card number) is transmitted to other Web sites, it is protected through the use of encryption, such as the Secure Socket Layer (SSL) protocol."[6]

20.    Despite acknowledging the risks of cyberattacks and recognizing its duty to do so, on information and belief, Defendant has not implemented reasonable cybersecurity safeguards or policies to protect clients' and their employees' PII or trained its IT or data security employees and agents to prevent, detect, and stop breaches of its systems. As a result, Defendant leaves significant vulnerabilities in its systems for multiple cybercriminals to exploit and gain access to clients' and their employees' PII.

***BenefitElect's Data Breach***

21.    On information and belief, Defendant collects and maintains its clients' and their employees' unencrypted PII in its computer systems.

22.    In collecting and maintaining PII, Defendant implicitly agreed that it will safeguard the data using reasonable means according to state and federal law.

23.    On April 2, 2025, Defendant "was alerted to suspicious activity on its systems." Ex. A.

24.    Defendant's internal investigation into the incident revealed that "certain files were accessed and/or exfiltrated without authorization between March 30, 2025, and March 31, 2025."

---

[6] BenefitElect Privacy Statement, BenefitElect, https://www.benefitelect.com/privacy-statement/ (last visited September 8, 2025).

Ex. A. Thus, cybercriminals had access to individuals' PII for two full days, during which they were able to steal PII from Defendant's systems.

25.     Despite this, Defendant waited until October 15, 2025—more than *six months* after the Data Breach began—to begin notifying victims that their PII had been compromised and stolen during the Data Breach. *See* Exhibit A.

26.     Defendant represented in its Breach Notice that it "implemented additional cybersecurity measures to further protect against similar events moving forward." Ex. A. However, this is too little too late because these steps should have been taken *before* the Data Breach.

27.     Defendant's Breach Noticed acknowledged the increased risk faced by victims of the Data Breach when it urged those affected to sign up for credit monitoring services and to "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and explanation of benefits as well as monitoring your free credit reports for suspicious activity and to detect errors." Ex. A.

28.     Because of BenefitElect's Data Breach, the sensitive PII of Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

29.     Concerningly, the notorious ransomware group "Kill Security" or "KillSec" claimed responsibility for the cyberattack.[7]

---

[7] Ransomlook, https://www.ransomlook.io/screenshots/killsec3/BenefitElect%C2%A0benefitelectcom.png (last visited October 24, 2025).



30.     KillSec is known for employing double extortion model, designed to encrypt files and demand ransom payments for decryption.[8]

31.     In its dark web post, KillSec provided screenshots of exfiltrated documents and threatened to publish the stolen data within a week if a ransom was not paid.[9]

32.     Ransomware groups can monetize stolen PII and sell it on the dark web as part of a full identity profile.[10] Buyers can then use that information to conduct different types of identity theft or fraud, such as filing a fake tax return, applying for a fraudulent mortgage or opening a bank account while impersonating the victim.[11]

---

[8] BlackFog, Kill Ransomware Group, https://www.blackfog.com/cybersecurity-101/kill-ransomware-group/ (last visited October 24, 2025).

[9] Ransomlook, https://www.ransomlook.io/screenshots/killsec3/BenefitElect%C2%A0benefitelectcom.png (last visited October 24, 2025).

[10] Anthony M. Freed, *Which Data Do Ransomware Attackers Target for Double Extortion?*, MALICIOUSLIFE BY CYBEREASON, https://www.cybereason.com/blog/which-data-do-ransomware-attackers-target-for-double-extortion (listed visited Mar. 6, 2025).

[11] *Id.*

33.     And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[12]

34.     Thus, on information and belief, Plaintiff's and the Class members' stolen PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

***Plaintiff's Experiences and Injuries***

35.     Plaintiff Fernando Cueto does not have a direct relationship with Defendant. Upon information and belief, his information was provided to Defendant in connection with his employment with one of Defendant's clients.

36.     Thus, BenefitElect obtained and maintained Plaintiff's PII.

37.     As a result, Plaintiff was injured by Defendant's Data Breach.

38.     Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner.  Plaintiff is careful to store any documents containing his PII in a secure location.

39.     Plaintiff provided his PII to Defendant and trusted the company would use reasonable measures to protect it according to BenefitElect's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

40.     Plaintiff reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of PII.

---

[12] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

41.    Thus, on information and belief, Plaintiff's PII, including but not limited to his full name and Social Security number, has already been published—or will be published imminently—by cybercriminals on the Dark Web.

42.    Through its Data Breach, Defendant compromised Plaintiff's PII.

43.    Plaintiff has spent—and will continue to spend—significant time and effort researching the Data Breach and monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice.

44.    And in the aftermath of the Data Breach, Plaintiff was alerted by his Discover credit and identity monitoring services that his Social Security was published on the dark web on October 23, 2025, in connection with BenefitElect.

45.    Once an individual's Sensitive Information is for sale and accessible on the dark web, as Plaintiff's PII is here as a result of the Breach, cybercriminals are able to use the stolen and compromised information to gather and steal even more information.[13]

46.    Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

47.    Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

48.    Plaintiff suffered actual injury from the exposure, theft, and dissemination of his PII on the dark web—which violates his rights to privacy.

---

[13] What do Hackers do with Stolen Information, Aura, https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited October 24, 2025).

49.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

50.     Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII right in the hands of criminals.

51.     Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

52.     Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

53.     In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[14] Therein, Cisco reported the following:

        a.      "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[15]

---

[14] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited September 8, 2025).
[15] *Id.* at 3.

b.    "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[16]

c.    89% of consumers stated that "I care about data privacy."[17]

d.    83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[18]

e.    51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[19]

f.    75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[20]

### *Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft*

54.    Because of Defendant's failure to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a.    loss of the opportunity to control how their PII is used;

b.    diminution in value of their PII;

c.    compromise and continuing publication of their PII;

d.    out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

---

[16] *Id.*
[17] *Id.* at 9.
[18] *Id.*
[19] *Id.*
[20] *Id.* at 11.

e.     lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

f.     delay in receipt of tax refund monies;

g.     unauthorized use of their stolen PII; and

h.     continued risk to their PII—which remains in Defendant's possession—and is thus at risk for future breaches so long as Defendant fails to take appropriate measures to protect the PII.

55.    Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

56.    The value of Plaintiff and Class's PII on the black market is considerable. Stolen PII trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

57.    It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

58.    One way that criminals profit from stolen PII is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data— first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

59.    The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet.

60.    In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

61.    Defendant disclosed the PII of Plaintiff and Class Members for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII of Plaintiff and Class Members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

62.    Defendant's failure to promptly and properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

63.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

64.    In 2021, a record 1,862 data breaches occurred, exposing approximately

293,927,708 sensitive records—a 68% increase from 2020.[21]

65.    Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation's ("FBI") 2024 Internet Crime Report details that reported losses from internet crime exceeded $16 billion in 2024 – a 33% increase from the prior year. [22]

66.    This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included threatening to release stolen data.

67.    In light of the information readily available and accessible on the internet before the Data Breach, Defendant, having elected to store the unencrypted PII of thousands of its current and former clients and their employees in an Internet-accessible environment, had reason to be on guard for the exfiltration of the PII and Defendant's type of business had cause to be particularly on guard against such an attack.

68.    Before the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack. Notably, data breaches are prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

69.    Prior to the Data Breach, Defendant knew or should have known that it should have encrypted its clients and their employees' Social Security numbers and other sensitive data

---

[21] *See 2021 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2022) https://notified.idtheftcenter.org/s/.
[22] FBI National Press Office, *FBI Releases Annual Internet Crime Report,* (Apr. 23, 2025), https://www.fbi.gov/news/press-releases/fbi-releases-annual-internet-crime-report.

elements within the PII to protect against their publication and misuse in the event of a cyberattack.

70.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***Defendant Failed to Follow FTC Guidelines***

71.     According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

72.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[23]  The FTC declared that, *inter alia*, businesses must:

> a.     protect the personal customer information that they keep;
>
> b.     properly dispose of personal information that is no longer needed;
>
> c.     encrypt information stored on computer networks;
>
> d.     understand their network's vulnerabilities; and
>
> e.     implement policies to correct security problems.

73.     The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

74.     Furthermore, the FTC explains that companies must:

> a.     not maintain information longer than is needed to authorize a transaction;

---

[23] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

b.    limit access to sensitive data;

c.    require complex passwords to be used on networks;

d.    use industry-tested methods for security;

e.    monitor for suspicious activity on the network; and

f.    verify that third-party service providers use reasonable security measures.

75.    The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

76.    In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former clients and their employees' data constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

77.    Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

78.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers;

monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

79.    Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

80.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

81.    Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following Nationwide Class:

> All individuals residing in the United States whose PII was compromised in BenefitElect's Data Breach, including all those individuals who received notice of the breach.

82.    Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

83.    Plaintiff reserves the right to amend the class definition.

84.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

85.    <u>Ascertainability</u>. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some individuals and sent them data breach notices.

86.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes thousands individuals.

87.    <u>Typicality</u>. Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

88.    <u>Adequacy</u>. Plaintiff will fairly and adequately protect the proposed Class's common interests. His interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

89.    <u>Commonality and Predominance</u>. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

        a.    if Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

b.    if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    if Defendant was negligent in maintaining, protecting, and securing PII;

d.    if Defendant breached contract promises to safeguard Plaintiff and the Class's PII;

e.    if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f.    if Defendant's Breach Notice was reasonable;

g.    if the Data Breach caused Plaintiff and the Class injuries;

h.    what the proper damages measure is; and

i.    if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

90.    <u>Superiority.</u> A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of

scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiff and the Class)

91.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

92.    Plaintiff and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

93.    Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

94.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

95.    Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff and Class Members' PII.

96.    Defendant owed—to Plaintiff and Class Members—at least the following duties to:

    a.    exercise reasonable care in handling and using the PII in its care and custody;

    b.    implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c.    promptly detect attempts at unauthorized access;

d.    notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their PII.

97.    Thus, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

98.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

99.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

100.    Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII, a necessary part of obtaining services from Defendant.

101.    Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

102.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC

publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class Members' sensitive PII.

103.    Defendant breached its respective duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

104.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

105.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

106.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

107.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and the Class's PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant collected and stored and the

foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

108.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

109.    But for Defendant's wrongful and negligent breach of its duties owed, Plaintiff and Class Members would not have been injured.

110.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

111.    The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII — whether by malware or otherwise.

112.    PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class Members' and the importance of exercising reasonable care in handling it.

113.    Defendant improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

114.    Defendant breached these duties as evidenced by the Data Breach.

115.     Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' PII by:

    a.    disclosing and providing access to this information to third parties and

    b.    failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

116.     Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

117.     Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

118.     Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

119.     As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

120.     And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by the Brain Cipher cybercriminal group or other cybercriminals on the dark web.

121.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

122.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

123.    Plaintiff and Class Members either directly contracted with Defendant or Plaintiff and Class Members were the third-party beneficiaries of contracts with Defendant.

124.    Plaintiff and Class Members or their third-party agents were required to provide their PII to Defendant as a condition of receiving services provided by Defendant. Plaintiff and Class Members or their third-party agents provided their PII to Defendant in exchange for Defendant's services.

125.    Plaintiff and Class Members or their third-party agents reasonably understood that a portion of the funds they paid would be used to pay for adequate cybersecurity measures.

126.    Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they or their third-party agents were required to provide based on Defendant's duties under state and federal law and its internal policies.

127.    Plaintiff and the Class Members accepted Defendant's offers by disclosing their PII to Defendant in exchange for services.

128.    In turn, and through internal policies, Defendant agreed to protect and not disclose the PII to unauthorized persons.

129.    In its Privacy Policy, Defendant represented that they had a legal duty to protect Plaintiff's and Class Members' PII.

130.    Implicit in the parties' agreement was that Defendant would provide Plaintiff and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their PII.

131.    After all, Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of such an agreement with Defendant.

132.    Plaintiff and the Class or their third-party agents fully performed their obligations under the implied contracts with Defendant.

133.    The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

134.    Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction and fair dealing may require more than honesty.

135.    Defendant materially breached the contracts it entered with Plaintiff and Class Members by:

a.    failing to safeguard their information;

b.    failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c.    failing to comply with industry standards;

d.    failing to comply with the legal obligations necessarily incorporated into the agreements; and

e.    failing to ensure the confidentiality and integrity of the electronic PII that Defendant created, received, maintained, and transmitted.

136.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

137.    Defendant's material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries (as detailed *supra*).

138.    And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

139.    Plaintiff and Class Members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

### THIRD CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

140.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

141.    This claim is pleaded in the alternative to the breach of implied contract claim.

142.    Plaintiff and Class Members conferred a benefit upon Defendant. After all, Defendant benefitted from (1) using their PII to provide services, and (2) accepting payment.

143.    Defendant appreciated or had knowledge of the benefits it received from Plaintiff and Class Members.

144.    Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

145.    Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

146.    Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

147.    Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff's and Class Members' (1) PII and (2) payment because Defendant failed to adequately protect their PII.

148.    Plaintiff and Class Members have no adequate remedy at law.

149.    Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

**FOURTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Class)**

150.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

28

151.     Given the relationship between Defendant and Plaintiff and Class Members, where Defendant became guardian of Plaintiff's and Class Members' PII, Defendant became a fiduciary by its undertaking and guardianship of the PII, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff and Class Members' PII; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

152.     Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendant's relationship with them—especially to secure their PII.

153.     Because of the highly sensitive nature of the PII, Plaintiff and Class Members would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII had they known the reality of Defendant's inadequate data security practices.

154.     Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class Members' PII.

155.     Defendant also breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

156.     As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**FIFTH CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Class)**

157.     Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

158.    Plaintiff and Class Members had a legitimate expectation of privacy regarding their PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

159.    Specifically, Plaintiff and Class Members had a reasonable expectation of privacy given Defendants' representations and Privacy Policy. Defendants' disclosure of Plaintiff's PII is highly offensive to the reasonable person.

160.    Defendants owed a duty to Plaintiff and Class Member to keep their PII confidential.

161.    The unauthorized disclosure and/or acquisition (i.e., theft) by a third party of Plaintiff's and Class Members' PII, is highly offensive to a reasonable person. It constitutes an invasion of privacy both by disclosure of nonpublic facts, and intrusion upon seclusion.

162.    Defendants' reckless and negligent failure to protect Plaintiff's and Class Members' PII constitutes an intentional interference with Plaintiff's and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

163.    Defendants' failure to protect Plaintiff's and Class Members' PII acted with a knowing state of mind when they permitted the Data Breach because they knew their information security practices were inadequate.

164.    Defendants knowingly did not notify Plaintiff's and Class Members in a timely fashion about the Data Breach.

165.    Because Defendants failed to properly safeguard Plaintiff's and Class Members' PII, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

166.    As a proximate result of Defendants' acts and omissions, the PII of Plaintiff and the Class Members was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages.

167.    Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII is still maintained by Defendants with their inadequate cybersecurity system and policies.

168.    Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendants' continued possession of their PII. A judgment for monetary damages will not end Defendants' inability to safeguard the PII of Plaintiff and the Class.

169.    Plaintiff and Class Members seek injunctive relief to enjoin Defendants from further intruding into the privacy and confidentiality of Plaintiff's and Class Members' PII. Plaintiff and Class Members seek compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendants, the costs of monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

**PRAYER FOR RELIEF**

Plaintiff and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C.      Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D.      Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E.      Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

F.      Awarding attorneys' fees and costs, as allowed by law;

G.      Awarding prejudgment and post-judgment interest, as provided by law;

H.      Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I.      Granting other relief that this Court finds appropriate.


### DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.


Date: October 24, 2025

                    Respectfully submitted,

                    By: */s/ Kim D. Stephens, P.S.*
                    Kim D. Stephens, P.S., OSB No. 030635
                    Jason T. Dennett*
                    **TOUSLEY BRAIN STEPHENS PLLC**
                    1200 Fifth Ave., Ste. 1700
                    Seattle, WA 98101-3147
                    Tel: (206) 682-5600
                    kstephens@tousley.com
                    jdennett@tousley.com

Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100
F: (872) 263-1109
raina@straussborrelli.com

*Pro hac vice forthcoming*
*Attorneys for Plaintiff and Proposed Class*

# EXHIBIT A

# EXHIBIT A

**Coalesce, LLC dba Benefitelect**
<<Return Mail Address>>



<<Name 1>> <<Name 2>>
<<Address 1>>
<<Address 2>>

<<City>>, <<State>> <<Zip>>

<<Date>>

**NOTICE OF [SECURITY INCIDENT] / [DATA BREACH]**

Dear <<Name 1>> <<Name 2>>:

Coalesce, LLC dba Benefitelect ("BEI") is a full-service employee benefits administration platform that your employer, or the employer of one of your family members, utilizes for benefit enrollment services. BEI writes to notify you of an event that may impact the privacy of information relating to you. BEI is providing information about the event, our response to it, and resources available to help you protect information, should you feel it appropriate to do so.

**What Happened?** On April 2, 2025, BEI was alerted to suspicious activity on its systems. After becoming aware of this activity, we quickly took steps to secure the system and launched an investigation with the assistance of a third-party specialist to determine the nature and scope of the activity. Our investigation determined that certain files were accessed and/or exfiltrated without authorization between March 30, 2025, and March 31, 2025. We then undertook a time-intensive review of the impacted data with the assistance of additional data privacy specialists to identify the individuals whose information may have been impacted. On August 26, 2025, we learned that your information was impacted as a result of this activity.

**What Information Was Involved?** Our review determined that the impacted data included benefits eligibility and onboarding census information such as your name, address, date of birth, and Social Security number. Please note that we are not aware of any actual or attempted misuse as a result of this activity.

**What We Are Doing**. The confidentiality, privacy, and security of information in our care is among our highest priorities. Upon learning of the suspicious activity, we took steps to secure the system and commenced an investigation to confirm the nature and scope of the event. We are reviewing existing security policies and have implemented additional cybersecurity measures to further protect against similar events moving forward. Additionally, we are notifying all impacted individuals so they may take steps to best protect their information, should they feel it is appropriate to do so.

As an added precaution, we are offering you immediate access to credit monitoring and identity theft protection services for [#] months at no cost to you through IDX. Information regarding these services and instructions on how to enroll can be found in the enclosed *Steps You Can Take to Help Protect Personal Information*. Please note that, due to security restrictions, you must complete the enrollment process yourself as we are not permitted to enroll you in these services.

**What You Can Do.** We encourage you to remain vigilant against incidents of identity theft and fraud by reviewing your account statements and explanation of benefits as well as monitoring your free credit reports for suspicious activity and to detect errors. We encourage you to enroll in the complimentary identity monitoring services being offered. Please also review the information contained in the enclosed *Steps You Can Take to Help Protect Personal Information*

**For More Information.** We understand that you may have questions about this incident that are not addressed in this letter. If you have additional questions or need assistance, please call our dedicated assistance line at [XXX-XXX-XXX] between the hours of 8:00 a.m. to 8:00 p.m. Eastern time, Monday through Friday, excluding all major U.S. holidays. You may also write to us at [Address].

Sincerely,

Coalesce, LLC dba Benefitelect

**STEPS YOU CAN TAKE TO HELP PROTECT PERSONAL INFORMATION**

**Enroll in Monitoring Services**

**1**. **Website and Enrollment.** Scan the QR image or go to [IDX URL] and follow the instructions for enrollment using your Enrollment Code provided at the top of the letter.

**2. Activate the credit monitoring** provided as part of your IDX identity protection membership. The monitoring included in the membership must be activated to be effective. Note: You must have established credit and access to a computer and the internet to use this service. If you need assistance, IDX will be able to assist you.

**3. Telephone.** Contact IDX at [TFN] to gain additional information about this event and speak with knowledgeable representatives about the appropriate steps to take to protect your credit identity.

**4. Review your credit reports**. We recommend that you remain vigilant by reviewing account statements and monitoring credit reports. Under federal law, you also are entitled every 12 months to one free copy of your credit report from each of the three major credit reporting companies. To obtain a free annual credit report, go to www.annualcreditreport.com or call 1-877-322-8228. You may wish to stagger your requests so that you receive a free report by one of the three credit bureaus every four months.

**Monitor Your Accounts**

Under U.S. law, a consumer is entitled to one free credit report annually from each of the three major credit reporting bureaus, Equifax, Experian, and TransUnion. To order a free credit report, visit www.annualcreditreport.com or call, toll-free, 1-877-322-8228. Consumers may also directly contact the three major credit reporting bureaus listed below to request a free copy of their credit report.

Consumers have the right to place an initial or extended "fraud alert" on a credit file at no cost. An initial fraud alert is a 1-year alert that is placed on a consumer's credit file. Upon seeing a fraud alert display on a consumer's credit file, a business is required to take steps to verify the consumer's identity before extending new credit. If consumers are the victim of identity theft, they are entitled to an extended fraud alert, which is a fraud alert lasting seven years. Should consumers wish to place a fraud alert, please contact any of the three major credit reporting bureaus listed below.

As an alternative to a fraud alert, consumers have the right to place a "credit freeze" on a credit report, which will prohibit a credit bureau from releasing information in the credit report without the consumer's express authorization. The credit freeze is designed to prevent credit, loans, and services from being approved in a consumer's name without consent. However, consumers should be aware that using a credit freeze to take control over who gets access to the personal and financial information in their credit report may delay, interfere with, or prohibit the timely approval of any subsequent request or application they make regarding a new loan, credit, mortgage, or any other account involving the extension of credit. Pursuant to federal law, consumers cannot be charged to place or lift a credit freeze on their credit report. To request a credit freeze, individuals may need to provide some or all of the following information:

1. Full name (including middle initial as well as Jr., Sr., II, III, etc.);
2. Social Security number;
3. Date of birth;
4. Addresses for the prior two to five years;
5. Proof of current address, such as a current utility bill or telephone bill;
6. A legible photocopy of a government-issued identification card (state driver's license or ID card, etc.); and
7. A copy of either the police report, investigative report, or complaint to a law enforcement agency concerning identity theft if they are a victim of identity theft.

Should consumers wish to place a credit freeze or fraud alert, please contact the three major credit reporting bureaus listed below:

| Equifax | Experian | TransUnion |
|---|---|---|
| https://www.equifax.com/personal/credit-report-services/ | https://www.experian.com/help/ | https://www.transunion.com/data-breach-help |
| 1-888-298-0045 | 1-888-397-3742 | 1-833-799-5355 |
| Equifax Fraud Alert, P.O. Box 105069 Atlanta, GA 30348-5069 | Experian Fraud Alert, P.O. Box 9554, Allen, TX 75013 | TransUnion, P.O. Box 2000, Chester, PA 19016 |
| Equifax Credit Freeze, P.O. Box 105788 Atlanta, GA 30348-5788 | Experian Credit Freeze, P.O. Box 9554, Allen, TX 75013 | TransUnion, P.O. Box 160, Woodlyn, PA 19094 |

## Additional Information

Consumers may further educate themselves regarding identity theft, fraud alerts, credit freezes, and the steps they can take to protect their personal information by contacting the consumer reporting bureaus, the Federal Trade Commission, or their state Attorney General. The Federal Trade Commission may be reached at: 600 Pennsylvania Avenue NW, Washington, D.C. 20580; www.identitytheft.gov; 1-877-ID-THEFT (1-877-438-4338); and TTY: 1-866-653-4261. The Federal Trade Commission also encourages those who discover that their information has been misused to file a complaint with them. Consumers can obtain further information on how to file such a complaint by way of the contact information listed above. Consumers have the right to file a police report if they ever experience identity theft or fraud. Please note that in order to file a report with law enforcement for identity theft, consumers will likely need to provide some proof that they have been a victim. Instances of known or suspected identity theft should also be reported to law enforcement and the relevant state Attorney General. This notice has not been delayed by law enforcement.

For *California residents*, the California Office of Privacy Protection (www.oag.ca.gov/privacy) may be contacted for additional information on protection against identity theft. The California Attorney General can be contacted at 1300 I Street, Sacramento, CA 95814, www.oag.ca.gov, 800-952-5225.

*For District of Columbia residents*, the District of Columbia Attorney General may be contacted at: 400 6th Street, NW, Washington, D.C. 20001; (202) 442-9828; and oag.dc.gov.

*For Florida residents,* the Florida Attorney General can be contacted at PL-01, The Capitol, Tallahassee, FL 32399-1050, https://www.myfloridalegal.com/, 850-414-3300.

*For Iowa residents*, the Iowa Attorney General can be contacted at 1305 E. Walnut Street, Des Moines, Iowa 50319, https://www.iowaattorneygeneral.gov/, 515-281-5926 or 888-777-4590.

*For Kentucky residents*, the Kentucky Attorney General may be contacted at 700 Capital Avenue, Suite 118, Frankfort, KY 40601, www.ag.ky.gov, 502-696-5300.

*For Maryland residents*, the Maryland Attorney General may be contacted at: 200 St. Paul Place, 16th Floor, Baltimore, MD 21202; 1-410-576-6300 or 1-888-743-0023; and https://www.marylandattorneygeneral.gov/.

*For Massachusetts residents*, You have the right to file and obtain a copy of a police report. You also have the right to request a security freeze, as described above. You may contact and obtain information from your state attorney general at: Office of the Massachusetts Attorney General, One Ashburton Place, Boston, MA 02108, 1-617-727-2200, https://www.mass.gov/contact-the-attorney-generals-office.

*For New Mexico residents*, consumers have rights pursuant to the Fair Credit Reporting Act, such as the right to be told if information in their credit file has been used against them, the right to know what is in their credit file, the right to ask for their credit score, and the right to dispute incomplete or inaccurate information. Further, pursuant to the Fair Credit Reporting Act, the consumer reporting bureaus must correct or delete inaccurate, incomplete, or unverifiable information; consumer reporting agencies may not report outdated negative information; access to consumers' files is limited; consumers must give consent for credit reports to be provided to employers; consumers may limit "prescreened" offers of credit and insurance based on information in their credit report; and consumers may seek damages from violators. Consumers may have additional

rights under the Fair Credit Reporting Act not summarized here. Identity theft victims and active-duty military personnel have specific additional rights pursuant to the Fair Credit Reporting Act. We encourage consumers to review their rights pursuant to the Fair Credit Reporting Act by visiting www.consumerfinance.gov/f/201504_cfpb_summary_your-rights-under-fcra.pdf, or by writing Consumer Response Center, Room 130-A, Federal Trade Commission, 600 Pennsylvania Ave. N.W., Washington, D.C. 20580.

*For New York residents,* the New York Attorney General may be contacted at: Office of the Attorney General, The Capitol, Albany, NY 12224-0341; 1-800-771-7755; or https://ag.ny.gov.

*For North Carolina residents*, the North Carolina Attorney General may be contacted at: 9001 Mail Service Center, Raleigh, NC 27699-9001; 1-877-566-7226 or 1-919-716-6000; and www.ncdoj.gov.

*For Oregon residents*, the Oregon Attorney General may be reached at 1162 Court Street NE, Salem, OR 97301, https://www.doj.state.or.us, 503-378-4400.

*For Rhode Island residents*, the Rhode Island Attorney General may be reached at: 150 South Main Street, Providence, RI 02903; www.riag.ri.gov; and 1-401-274-4400. Under Rhode Island law, individuals have the right to obtain any police report filed in regard to this event.

*For South Carolina residents*, the South Carolina Department of Consumer Affairs may be reached at 293 Greystone Blvd., Ste. 400, Columbia, SC 29210, www.consumer.sc.gov, 800-922-1594.